**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AEP ENERGY, INC., an Illinois corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. __ CV ____** |
| **v.** | ) | |
| | ) | |
| **INFINITY MARKETING GROUP, d/b/a INFINITY ENERGY SOLUTIONS, a Florida corporation, and DONALD WOOD, a Florida resident,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**COMPLAINT**

Plaintiff AEP Energy, Inc. ("AEP Energy"), for its complaint against Infinity Marketing Group, d/b/a Infinity Energy Solutions ("IES") and Donald Wood alleges and states as follows:

**Nature of the Claims**

1.     AEP Energy is a retail energy supplier.  Among other ventures, AEP Energy is a Certified Retail Electric Service provider that supplies electricity to residential and business customers in various deregulated electricity markets.

2.     In order to pursue potential residential and business clients in deregulated markets, AEP Energy committed to the terms of two separate contracts – one for residential customers and one for commercial customers – with Defendant IES.

3.     IES is a company that provides telemarketing services.  Donald Wood is its President and principal.  Under the direction and control of Wood, IES and Wood operate a telemarketing call center, purporting to have particular expertise marketing energy services.

4.     AEP Energy brings this action because IES has breached the terms of both the residential and commercial contracts, and failed to live up to its contractual indemnification obligations, causing injury to AEP Energy.  Defendant Wood has engaged in separate tortious conduct, which increased the harm to AEP Energy and caused additional injury.

5.     IES breached the residential contract by, among other things, failing to comply with controlling telemarketing laws and regulations. In its November 2012 contract with AEP Energy for residential customers, IES expressly commits to comply with all applicable federal, state and local laws and regulations.  IES also expressly promises that its calls to residential numbers will "not violate federal or state do-not-call rules and regulations."

6.     In April 2014, AEP Energy was sued in a lawsuit brought under the federal Telephone Consumer Protection Act ("TCPA"). That class action lawsuit alleged that he and other class members received telemarketing calls on behalf of AEP Energy on residential phone numbers that had been registered on the federal Do-Not-Call list, in violation of the TCPA.  IES made those challenged calls, and IES ultimately conceded that it had not been screening the numbers it called against the federal Do-Not-Call list.

7.     Facing potential TCPA liability of up to $500 per offending call, AEP Energy settled the *Charvat* litigation for six million dollars.  Because IES' breach of contract caused the alleged TCPA violations, IES must make AEP Energy whole for the settlement payment and for the attorneys' fees and other costs AEP Energy incurred in responding to the litigation.  In addition, IES is contractually obligated to indemnify AEP Energy for the costs of the settlement, including attorneys' fees, under the terms of an indemnification provision in the contract.

8.     AEP Energy also has been injured by Defendant Wood's fraud. When AEP Energy learned of the *Charvat* allegations, it demanded immediate assurances that IES was not violating

Do-Not-Call requirements and that IES would not make any future telemarketing calls to numbers on the national Do-Not-Call Registry. Wood represented to AEP Energy that IES had a written policy of compliance with Do-Not-Call requirements that it had followed since the start of the residential calling program. Wood promised that all future calls would be made only to numbers not on the Do-Not-Call list. Wood's representations about IES compliance were false when made, and caused substantial additional injury to AEP Energy.

9.    IES and Wood also have committed independent torts and breaches of the separate contract governing telemarketing to commercial customers. Under that agreement, IES commits that it will not solicit business from commercial customers it brought to AEP Energy. Since termination of the commercial contract as of August 2014, however, IES has breached that contract by soliciting – on behalf of other energy companies -- commercial customers that IES originally brought to AEP Energy. Wood's participation in that misconduct constitutes a tortious interference with the contracts and business expectancies AEP Energy has with its customers.

**Jurisdiction and Venue**

10.    This Court has jurisdiction over all claims in this Complaint pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between plaintiff AEP Energy (an Illinois corporation) and all defendants (who are citizens of Florida) and because the amount in controversy exceeds $75,000.

11.    Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District.

**The Parties**

12.    Plaintiff AEP Energy, Inc. is an Illinois corporation with its principal place of business in Chicago, IL. For purposes of diversity jurisdiction, it is a citizen of Illinois.

3

13.     Defendant Infinity Marketing Group, Inc., d/b/a Infinity Energy Solutions, is a Florida corporation with its principal place of business in Pinellas County, Florida.  For purposes of diversity jurisdiction, IES is a citizen of Florida.

14.     Defendant Donald Wood is an individual who resides in Pinellas County, Florida, and who is a citizen of Florida for purposes of diversity jurisdiction.

### Substantive Allegations

**A.      The Parties and the Industry**

15.     During most of the 20th Century, electricity was a heavily regulated commodity. For the most part, individuals and businesses were required to purchase their electricity from a single supplier.  Each municipality had one electrical utility, and all residents of that municipality – individual citizens and commercial enterprises – generally were obligated to purchase their electricity from that municipal utility.

16.     In the late 20th and early 21st centuries, certain utility markets were de-regulated. This means that, in those deregulated markets, a consumer – whether individual or business – has the choice between continuing to buy power from the local utility, or purchasing electricity from a retail energy supplier.

17.     Plaintiff AEP Energy was created, and is still operated, to offer retail energy to customers in deregulated markets.

18.     Like several participants in the retail power marketing industry, AEP Energy does not operate its own call center with dedicated telemarketing representatives.  Rather, it seeks to find and associate with skilled, ethical telemarketing companies, preferably with experience in the retail power markets.

19.     In 2012, AEP Energy personnel in Illinois reached out to IES about the possibility of AEP Energy engaging IES to market AEP Energy services to residential customers in the deregulated markets in Ohio.  In communications with AEP Energy at that time, Don Wood and others held IES out as an experienced, trustworthy telemarketer serving deregulated electricity markets.  Indeed, even today IES' website continues to proclaim that IES is a skilled and reliable telemarketing partner for energy retailers:

> At Infinity Energy Solutions, we have a 165-seat top-notch call center with the best quality agents from the greater Tampa Bay Area, currently enrolling up to 1000 residential customers daily and up to 12 million kilowatts weekly! IES has been incorporated for over 10 years and has been involved in a number of call centers in and around the greater Tampa Bay Area as well. We have data down to a science and can assure you we will not be a big headache. We have TPV contracts, scripts and ftp sites on the shelf to make things easy and turn key for you. Compliant sales scripts, verification scripts and rebuttals on hand are sufficient and will meet your needs to a tee. We specialize exclusively in residential and commercial customer acquisition campaigns, and have a top-notch firm with a proven track record of success, growth and integrity. IES has facilities, capitol, management and experience to grow as a vendor, which in turn will help your company increase its customer base fast and effectively. Here we record every single call start to finish, and are completely transparent, meaning that you have the ability to access any call generated on your enrollment campaign. Our company takes pride in the quality of each and every member of our professional team, from agents to top-level executives, and we will carry ourselves a cut above the rest, time and time again.

IES website, http://www.infinityenergysolutions.com/about.html.

20.     The IES website also identifies those markets in which IES offers services.  One such market is Illinois, in which IES purports to offer "Electricity/Gas" services in Ameren and Commed (sic) territories.  http://www.infinityenergysolutions.com/service.html.  IES also offers services in Ohio.

**B.      The Contracts Between AEP Energy and IES**

21.     In reliance on the assurances from Wood and IES as to IES' expertise and reliability, in November of 2012 AEP Energy entered into a contract with IES for telemarketing

to Ohio residential customers. At that time, AEP Energy and IES were already operating under a similar contract for telemarketing to commercial (business) customers in Ohio. IES had entered into that contract with an AEP Energy affiliate (BSE Solutions, LLC), and AEP Energy later assumed the contractual obligations from BSE Solutions.

22. Both the residential and the commercial contracts obligate IES to operate call centers making outbound telemarketing calls to potential AEP Energy customers. One agreement, the Outbound Call Center Agreement, dated March 13, 2012, covers telemarketing by IES to potential *commercial* customers in Ohio, and shall be referred to herein as OBCCA-Commercial. (OBCCA-Commercial is attached as Exhibit 1.)

23. A separate but similar contract, the Outbound Telemarketing Agreement, sets forth the terms by which IES is to telemarket AEP Energy services to prospective *residential* customers in certain service territories within Ohio. That contract, dated November 5, 2012, shall be referred to herein as OBTA-Residential. (OBTA-Residential is attached as Exhibit 2.)

24. Under to the OBTA-Residential, IES agrees to market "energy and/or energy-related services and products" to Ohio residential consumers on behalf of AEP Energy. Specifically, IES commits to undertake a telephone marketing program whereby it will reach out to Ohio residents and encourage them to enter into agreements selecting AEP Energy as their electricity supplier. IES is to receive compensation for each customer it signs up to receive AEP Energy services.

25. In exchange for the compensation it is to receive, IES assumes several duties under the OBTA-Residential. Specifically, the OBTA-Residential provides:

- IES, referred to as the "OBTM," agrees that all calls to prospective customers shall be made during normal business calling hours, "subject to compliance with all relevant telemarketing law, rules and regulations." OBTA-Residential, Ex. 2 at ¶ 1.

- IES guarantees that, if it supplies the leads, those leads shall be "legitimate residential phone numbers and do not violate federal or state do-not-call ('Regulatory DNC') rules and regulations." OBTA-Residential, Ex. 2 at ¶ 2. At all times while the agreement was in place, IES supplied virtually all of the leads, and 100% of the leads that were alleged to have violated Regulatory DNC rules and regulations.

- Although paragraph 1 obligates IES to comply with relevant telemarketing law, rules and regulations, the OBTA-Residential provides a broader guarantee of compliance in paragraph 9. In that provision, IES agrees that it "shall comply with all federal, state and local laws, rules, and regulations and any other governmental or quasi-governmental rules and regulations . . . in regard to the conduct of Services rendered pursuant to the Agreement." IES further commits that it "will strictly adhere to all rules and regulations applicable to telemarketing in the Service Territories." OBTA-Residential, Ex. 2 at ¶ 9.

- IES also agrees to indemnify AEP Energy if AEP Energy is damaged by reason of IES's failure to perform as promised. Specifically, IES promises to indemnify AEP Energy from any liabilities, judgments and expenses, including attorneys' fees, that arise out of claims or suits with respect to "a breach of the Agreement by OBTM [IES] or the negligent or willful acts of OBTM [IES]." OBTA-Residential, Ex. 2 at ¶ 17.

26. Both the Residential and the Commercial contracts contain similar provisions that bar IES from later soliciting, on behalf of other energy providers, customers that IES initially brought to AEP Energy. Specifically, under both agreements, IES promises that it "shall not directly or indirectly, either on its own behalf or on behalf of any other person or entity, attempt to persuade or solicit any customer for whose account OBTM [IES] has been paid to acquire." OBCCA-Commercial, Ex. 1 at ¶ 8, OBTA-Residential, Ex. 2 at ¶8. Under the OBCCA-Commercial, the ban on solicitation of AEP Energy customers who IES helped acquire is permanent; under the OBTA-Residential, the ban lasts for one year following termination of the customer's agreement with AEP Energy.

**B.      IES' Breach of the OBTA-Residential and the Lawsuit against AEP Energy.**

27. Soon after the parties entered into the OBTA-Residential, IES began making calls in an effort to obtain new residential customers for AEP Energy.

28.     In telemarketing to Ohio residents, IES and Wood did not request leads from AEP Energy.  Instead, IES purchased leads from one or more third party vendors.

29.     In June of 2013, while the IES program for residential customers was ongoing, the Ohio Public Utility Commission prepared and posted an electronic notice that advised Ohio residents of their right to prevent unwanted telemarketing calls by placing their telephone numbers on the National Do Not Call Registry.  The post described the Do-Not-Call ("DNC") list and program, advised consumers how to register their numbers, and detailed the restrictions on telemarketers when a number has been listed on the DNC registry.

30.     AEP Energy forwarded this detailed post to IES, including to Bart Hawk, then the IES COO.   On the same day he received the notice from AEP Energy, Hawk wrote back, representing that IES was well aware of the restrictions described by the Ohio Commission and reassuring AEP Energy that "we abide by all DNC and disclosure requirements."

31.     The IES representation that it was abiding by all Do-Not-Call requirements was false.

32.     On April 29, 2014, an Ohio resident named Phillip Charvat filed a class action lawsuit in the United States District Court for the Northern District of Illinois.  The complaint in that lawsuit, attached hereto as Exhibit 3, alleges that telemarketing calls made by or on behalf of AEP Energy were made to Charvat on a residential telephone number that had been registered on the federal Do-Not-Call list.  Charvat alleges that the calls to his registered number violated the TCPA, 47 U.S.C. § 227.  Charvat alleges that similar illegal telemarketing calls were made by or on behalf of AEP Energy to hundreds of thousands or even millions of potential customers whose numbers had been registered to the DNC list.  The lawsuit requests that a class of all such consumers be certified and that the class recover $500 per violation.

33.     AEP Energy learned of the suit on the day, or the day after, it was filed.

34.     The allegations in the complaint came as a surprise to AEP Energy. Throughout the life of the Ohio telemarketing program run by IES, AEP Energy had not received any complaints. Although AEP Energy did receive a complaint alleging that a 2014 telemarketing call was made to a Pennsylvania resident whose number was on Pennsylvania's do-not-call list, that call had been made outside of Ohio by a vendor other than IES. No one had suggested to AEP Energy that IES might be disregarding the TCPA and calling numbers on the federal DNC list.

35.     In response to the allegations in the *Charvat* complaint, AEP Energy took several steps. First, AEP Energy sent IES a letter that included a copy of the *Charvat* complaint and demanded that IES indemnify AEP Energy pursuant to the OBTA-Residential's indemnification clause.

36.     Second, AEP Energy opened a dialogue with the lawyers representing the plaintiff and the putative class in the *Charvat* litigation. Because the TCPA allows for recovery of up to $500 per violation, without requiring any proof of actual injury, AEP Energy faced a huge theoretical liability. If the complaint was correct that there had been as many as 100,000 illegal calls, the potential exposure for AEP Energy was up to $50 million. A million violative calls would generate potential exposure of up to $500 million. In light of the potential for ruinous exposure, AEP Energy entered into early settlement discussions with the plaintiff's lawyers. AEP Energy kept IES informed of those discussions.

37.     Third, AEP Energy demanded that IES provide AEP Energy with a copy of the IES call log, listing all phone numbers that IES had contacted as part of the residential telemarketing program.

38.     Fourth, AEP Energy reached out to IES to discuss compliance with Do-Not-Call requirements.  AEP Energy sought assurance that IES had not been violating federal law, as the *Charvat* complaint asserted.  Even more importantly, AEP Energy demanded assurance that IES affirmatively would commit to scrub all future residential numbers against the federal DNC list. AEP Energy knew that it would need to shut down IES's operations on its behalf if IES was making additional calls that could expose AEP Energy to further liability.

**D.     Defendant Wood's Reaction to the *Charvat* Complaint: Misrepresent IES Compliance in Order to Keep on Violating -- Make as Much Illegal Profit as Possible Before the Operation Gets Shut Down.**

39.     In response to AEP Energy's inquiries, Wood knowingly supplied false information about IES compliance.

40.     Wood repeated the assurances that IES had provided in mid-2013, representing that IES had at all times complied with Do-Not-Call rules and regulations.  Wood assured AEP Energy that IES prides itself on its compliance.  Wood had IES lawyers supply a written "Do Not Call Policy and Procedures" document that IES supposedly followed and that supposedly committed the organization to comply with state and federal DNC requirements.

41.     By mid-June, AEP Energy still had not received the IES call log that it had requested in early May.  Commission payments to IES under the terms of the contracts were coming due, and AEP Energy contemplated withholding those payments until IES provided the call log and assured AEP Energy that no violations were still occurring.

42.     When IES did not receive payment on exactly the day it anticipated, Wood began calling, texting and emailing AEP Energy to demand payment.  Wood made IES's production of the call log to AEP Energy conditional upon IES receiving payment.

43.     AEP Energy ultimately agreed to make the payment, on the conditions that (1) IES immediately provide the call log and (2) IES provide specific assurances that IES was, at that time,

complying with all DNC regulations and not calling numbers on the federal DNC list. Wood expressly represented that IES was scrubbing all numbers against the federal DNC list and not making calls to numbers on that Do-Not-Call list.

44.     All of Wood's representations as to IES compliance were knowingly and intentionally false when made. In May and June of 2014, when Wood represented that IES was adhering to the requirements of the TCPA and the Do-Not-Call registry, Wood knew that IES was not scrubbing its third party leads against the national Do-Not-Call list.

45.     Eventually, IES itself conceded that it had called several hundred thousand residential phone numbers that were contained on the then-current federal DNC list. That history of non-compliance was made clear to AEP Energy when it finally received and reviewed the IES call log. That log revealed that from November 2012 onward IES had been making calls to residential telephone numbers without regard to whether those numbers were on the federal DNC list, sometimes calling the same registered number multiple times. On information and belief, Defendant Wood, the IES CEO, was fully aware of and directing that strategy of non-compliance.

46.     The IES call log also reveals that in May and June of 2014, during a time when Wood promised that all leads were being scrubbed against the national DNC list, IES was actually *increasing* its level of non-compliance. Although Wood knew that IES's conduct was being attacked in a federal court lawsuit, IES continued to telemarket to residential numbers without regard to whether those numbers were on the Do-Not-Call list. Indeed, in late April and early May of 2014, IES increased the number of agents working on the AEP Energy residential program, and kept those additional agents in place through June. As many as 40% of the calls IES made to numbers on the federal DNC list were placed after Phillip Charvat filed his lawsuit against AEP Energy.

11

47.     It is easy to understand what Wood was doing.  Wood is the President and majority owner of IES.  Wood is the sole decision-maker for IES.  On information and belief, Wood also derives all, or virtually all, of his personal income and wealth from IES operations, withdrawing money from IES as he wishes and needs.

48.     Once the *Charvat* litigation was filed, it immediately became clear to Wood that IES's residential telemarketing program for AEP Energy was at risk of being terminated because of IES' failure to comply with federal laws and regulations.  The notoriety of IES's non-compliant behavior, and IES's potential exposure to AEP Energy under the OBTA-Residential, posed threats to the very corporate existence of IES.

49.     On information and belief, Wood made the conscious decision in 2014 to siphon as much money as possible out of IES before its operations were shut down.  Wood understood that continued operations, in a manner the violated federal DNC regulations, would greatly increase AEP Energy's legal damages.  Because IES is contractually obligated to indemnify AEP Energy for all damages suffered as a result of IES breaches of the OBTA-Residential, Wood also understood that continued, non-complaint operations increased IES's liability.

50.     Despite the certainty of increased legal exposure for IES, Wood decided to keep operating the residential telemarketing program, to perpetuate the practice of not scrubbing leads against the federal DNC list, and to misrepresent IES compliance.  Wood even exacerbated the injuries by adding more agents to the telemarketing program.  An average day's shift at IES in May 2014 had 66 agents working on the AEP Energy residential program, more than double the daily average number of agents working on the program in March 2014.  Wood added more agents, and kept IES staff running full shifts, even though each call generated additional, possible TCPA exposure for AEP Energy and indemnification exposure for IES.

51.     On information and belief, Wood made the decisions to misrepresent IES compliance, and to operate and expand the telemarketing program, to benefit himself personally. Those decisions increased IES's indemnification liability, and were thus counter to IES's corporate interests.  Wood used IES as an instrumentality to prolong and enhance his ability to make money, personally, from IES's non-compliant telemarketing operations.

## C.     The Termination of IES and the *Charvat* Settlement

52.     In July 2014, AEP Energy received the early results of its investigation of the IES call log, indicating that IES had been misrepresenting its behavior, and that IES actually had been making hundreds of thousands of calls without screening them against the federal DNC list.

53.     Also in July 2014, AEP Energy learned for the first time that IES had failed to comply with Ohio law requiring all telemarketers to register with the State.  IES attempted to make a hurried, after-the-fact registration, but that could not alter the fact that IES had been marketing without a license to Ohio residents and businesses since 2012.  In light of these material breaches of the OBTA-Residential and the OBCCA-Commercial, AEP Energy terminated both contracts and ceased remitting payments to IES.  AEP Energy terminated the contracts pursuant to the termination provisions. Ex. 1, OBCCA-Commercial at ¶ 4, Ex. 2, OBTA-Residential at ¶ 4.

54.     Early in the *Charvat* litigation AEP Energy agreed with class counsel to participate in mediation before a retired federal magistrate judge.  AEP's investigation of the IES call logs suggested that IES's behavior had exposed AEP Energy to a potential, theoretical liability of up to $500,000,000, although AEP Energy had many arguments and defenses that could, if accepted, reduce or eliminate that exposure.  In that mediation, AEP sought to negotiate the best deal possible -- one that allowed it to survive by eliminating the possibility of a judgment in the hundreds of

millions of dollars. AEP Energy kept IES informed of its thinking, and informed it in advance of the mediation.

55.     With the mediator's help, the parties ultimately agreed upon a $6 million settlement, funded entirely by AEP Energy. That settlement agreement has been signed and at a hearing on June 18, 2015 the federal judge presiding over the *Charvat* litigation granted preliminary approval to that settlement.

## COUNT I
## BREACH OF THE OBTA-RESIDENTIAL
### (Against Defendant IES)

56.      As paragraph 56, AEP Energy restates and adopts paragraphs 1-55 as if set forth here fully.

57.     At all times prior to termination of that agreement, the OBTA-Residential was a binding and enforceable contract between IES and AEP Energy.

58.     By engaging in an outbound telemarketing program to Ohio residents that failed to screen numbers against the national Do-Not-Call Registry, IES committed material breaches of the OBTA-Residential by:

    a.  Failing to comply with all relevant telemarketing law, rules and regulations;

    b.  Employing leads procured by IES, without ensuring that the IES calls to those numbers did not violate federal or state do-not-call rules and regulations;

    c.  Failing to comply with all federal, state and local laws, rules and regulations applicable to the offering of AEP Energy services; and

    d.  Failing to adhere strictly to all rules and regulations applicable to telemarketing in the service territories covered by the OBTA-Residential.

59.     As a direct and proximate result of the IES breaches of the OBTA-Residential, AEP Energy has suffered damages, including but not limited to:

    a.  The $6 million paid to settle the *Charvat* litigation;

14

b. The mediation fees paid by AEP Energy;

c. The fees AEP Energy paid to experts to assist in reviewing IES's call logs and IES's non-compliant conduct of the telemarketing program;

d. The costs of confirmatory discovery in the *Charvat* litigation; and

e. The other costs and attorney's fees AEP Energy incurred in connection with the *Charvat* litigation and in bringing this action.

## COUNT II
## CONTRACTUAL INDEMNIFICATION
### (Against Defendant IES)

60.     As paragraph 60, AEP Energy restates and adopts paragraphs 1-59 as if set forth here fully.

61.     The OBTA-Residential contains an enforceable indemnification provision. Paragraph 17 of that agreement, entitled "**Indemnification**," states in relevant part:

> OBTM [IES] shall indemnify and hold harmless AEP Energy from and against any and all liabilities, judgments and expenses, including attorney's fees, arising out of any claims, suits or proceeding brought before any court, arbitrator, administrative, governmental or industry self-regulatory body or other tribunal with respect to . . . a breach of the terms of the Agreement by OBTM or the negligent or willful acts of OBTM. Ex. 2 at ¶ 17.

62.     The *Charvat* lawsuit is a "claim, suit or proceeding" for purposes of the indemnification provision.

63.     The allegations in the *Charvat* lawsuit seek to impose liability against AEP Energy based on a breach of the OBTA-Residential by IES and/or on the negligent or willful acts of IES.

64.     AEP Energy has sent timely notices to IES informing IES of AEP Energy's entitlement to and demand for indemnification under the contract.

65.     AEP Energy is entitled to indemnification from IES pursuant to the OBTA-Residential, indemnifying AEP Energy for the following liabilities, judgments and expenses:

15

a. The $6 million paid to settle the *Charvat* litigation;

b. The mediation fees paid by AEP Energy;

c. The fees AEP Energy paid to experts to assist in reviewing IES's call logs and IES's non-compliant conduct of the telemarketing program;

d. The costs of confirmatory discovery in the *Charvat* litigation; and

e. The other costs and attorney's fees AEP Energy incurred in connection with the *Charvat* litigation and in bringing this action.

## COUNT III
## FRAUD
### (Against Defendant Wood)

66. As paragraph 66, AEP Energy restates and adopts paragraphs 1-65 as if set forth here fully.

67. In May and June of 2014, AEP Energy considered whether it needed to terminate the IES residential telemarketing program as a result of potential misconduct by IES. Before it allowed telemarketing to continue, AEP Energy demanded commitments from IES and Wood concerning IES's ongoing and future compliance with Do-Not-Call requirements.

68. On multiple occasions in May and June of 2014, Wood represented to AEP Energy that IES was complying with all applicable regulations, including all rules and regulations governing the calling of residential numbers that are listed on the federal Do-Not-Call registry. Wood represented that, from May 2014 forward, IES would scrub its leads against the federal Do-Not-Call list and would not call any numbers on that DNC list.

69. Those representations by Wood as to IES's ongoing and future compliance were false when made, and Wood knew those representations to be untrue.

70.     Wood made the representations about IES's compliance with Do-Not-Call requirements for the purpose of inducing AEP Energy to continue allowing IES to conduct its telemarketing campaign.

71.     On information and belief, Wood misrepresented the facts to AEP Energy in order to benefit himself personally. All of the additional TCPA violations that occurred after the *Charvat* suit was filed exposed IES to additional exposure under its contractual obligation to indemnify AEP Energy. Wood controlled every aspect of IES's operations. In May and June of 2014, Wood misrepresented the facts to AEP Energy so that Wood, personally, could benefit from IES's continued, illegal operations.

72.     AEP Energy relied, to its detriment, on Wood's false representations. In reliance on Defendant Wood's misstatements of fact, AEP Energy allowed IES to continue its telemarketing campaign from the date of the filing of the *Charvat* action through July of 2014.

73.     From late April onwards, IES made thousands of new calls to telephone numbers on the federal DNC list. The IES call logs that IES eventually provided to AEP Energy reveal that almost 40% of the calls to numbers on the Do-Not-Call list were made after the *Charvat* action was filed. The fraud by Wood created massive additional legal exposure for AEP Energy. In addition, AEP Energy's reputation was harmed, and AEP Energy was forced to pay substantial commissions to IES that AEP Energy would not have been required to pay if Wood had not misrepresented IES's material breaches of the OBTA-Residential.

74.     AEP Energy is entitled to recover from Wood all of the damages it incurred by not terminating the IES residential marketing program as of the date the *Charvat* action was filed.

**E.      The Ongoing, Post-Termination Misconduct of IES and Wood**

75.      When AEP Energy terminated the contracts with IES in July 2014, AEP Energy ensured that it would not suffer any additional TCPA liability for IES's illegal telemarketing programs.  That termination did not, however, put an end to the misconduct of IES and Wood.

76.      Both the OBCCA-Commercial and the OBTA-Residential impose continuing obligations on IES even after termination.  Specifically, paragraph 8 of the OBCCA-Commercial, entitled **"Limitation on Use of Customer Information; Exclusivity,"** states that IES "shall not, directly or indirectly, either on its own behalf or on behalf of any other person or entity, attempt to persuade or, solicit any customers for whose account [IES] has been paid to acquire" for AEP Energy.   The OBTA-Residential has a similar prohibition.

77.      Additionally, both contracts include a virtually identical paragraph 14, labeled "Confidentiality."  That provision establishes that all information that AEP Energy provides to IES about AEP Energy business, and all information that IES develops or learns during the course of performing the contract, is protected Confidential Information.   IES commits that it will not disclose, use or maintain such AEP Energy Confidential Information, except as necessary to its performance of its obligations under the agreements. Ex. A, OBCCA-Commercial at ¶ 14; Ex. B, OBTA-Residential at ¶ 14.

78.      The prohibition against soliciting customers brought to AEP Energy, and the Confidentiality provision, are vital to protecting AEP Energy's confidential customer information. Through its work for AEP Energy, IES was able to learn critical information about the commercial customers it signed up for AEP Energy, including the customers' identities, the termination dates of their electrical supply contracts, and the prices being paid for energy.  Without the protections

of Paragraphs 8 and 14, IES could simply stop working for AEP Energy and immediately begin poaching AEP Energy's clients for another energy supply company.

79.     This is precisely what IES has done.  Since the termination of its relationship with AEP Energy, IES has been using the precise information protected by Paragraphs 8 and 14 of the OBCCA-Commercial on behalf of other energy suppliers.  On at least three separate occasions about which AEP Energy is aware, IES has approached AEP Energy customers on behalf of other suppliers and encouraged those customers to leave AEP Energy.  IES is aware of these customers' identities, of the end-dates of their existing supply contracts, and of the prices they currently are paying for electricity, solely because of the work IES did on behalf of AEP Energy.

80.     Wood is personally involved with this effort to poach AEP Energy customers.  His name appears on the offers that IES has extended to the existing AEP Energy customers.  On information and belief, Wood is responsible for designing and implementing the strategy to target AEP Energy customers, and benefits personally from the revenues that strategy generates.

81.     On information and belief, IES has gone so far as to design a specific program to identify, target, and contact existing AEP Energy customers.  IES is using scripts that say, in substance, "I am calling on behalf of IES.  Some months ago we enrolled you with AEP Energy.  Our records reflect that your contract is up for renewal and expires on [date].  We have a great offer for you on behalf of [Competitor to AEP Energy]."

**COUNT IV**
**BREACH OF THE OBCCA-COMMERCIAL**
**(Against Defendant IES)**

82.     As paragraph 82, AEP Energy restates and adopts paragraphs 1-81 as if set forth here fully.

83. The OBCCA-Commercial is a binding and enforceable contract between IES and AEP Energy.

84. Although the OBCCA-Commercial was effectively terminated as of August 1, 2014, Paragraph 8 of that agreement imposes ongoing duties on IES.

85. According to Paragraph 8, IES may not solicit business from commercial customers it successfully acquired for AEP Energy. According to Paragraph 14, IES may not use AEP Energy's confidential information for any purpose other than providing services under the OBCCA-Commercial.

86. IES has breached paragraphs 8 and 14 of the OBCCA-Commercial by offering, to AEP Energy customers that were acquired for it by IES, energy services on behalf of AEP Energy competitors.

87. The conduct of IES has caused direct and proximate injury to AEP Energy, in an amount to be determined at trial, by causing AEP Energy to lose the future business of existing customers, by injuring AEP Energy's reputation, and by denying AEP Energy the benefit of the commissions it paid to IES for customer acquisition services in 2012-2014.

88. Unless the breaches of contract are enjoined, AEP Energy will continue to suffer injury into the future. The full extent of that injury is not knowable because AEP Energy does not know how many and which customers are receiving the improper solicitations from IES and Wood.

**COUNT V**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**
**(Defendants IES and Wood)**

89. As paragraph 89, AEP Energy restates and adopts paragraphs 1-88 as if set forth here fully.

90.     From November 2, 2012 through July 2014, AEP Energy and IES had a binding contractual relationship.   Pursuant to the OBCCA-Commercial, IES solicited commercial customers on behalf of AEP Energy.  When IES succeeded in persuading a commercial entity to become an energy customer of AEP Energy, IES received a commission from AEP Energy.

91.     As a result of entering into customer agreements with customers brought to it by IES, AEP Energy had a reasonable expectation of continued business relations with those customers during and after the terms of those customer agreements.

92.     Wood and IES have, without privilege or justification, interfered with the reasonable expectancies held by AEP Energy.

93.     Wood and IES have interfered wrongfully and intentionally, with full awareness of the fact that their conduct involves the misappropriation of AEP Energy's protected customer information, and is prohibited by the terms of the OBCCA-Commercial.

94.     AEP Energy has been harmed by the wrongful conduct of Wood and IES.  As a direct and proximate result of the tortious interference by Wood and IES, AEP Energy has lost lucrative future business with existing customers, its reputation has been damaged, and it has been denied the benefit of the customer relationships for which it paid commissions to IES during the life of the OBCCA-Commercial.

95.     Unless this Court enjoins the misconduct of IES and Wood, AEP Energy will continue to suffer injury into the future.  The full extent of that injury is not knowable because AEP Energy does not know how many and which customers are receiving the improper solicitations from IES and Wood.

96.     AEP Energy is suffering irreparable injury and cannot be made whole with money damages.  AEP Energy is losing not just commissions, but ongoing business relationships with

customers that have the potential to last long into the future. In addition, AEP Energy imposed the requirements on IES marketing to existing customers in order to protect AEP Energy's confidential business information, including its customers' identities, their contract termination dates, and their pricing. All value in that confidential information will be lost if Wood and IES are not enjoined.

**WHEREFORE**, Plaintiff AEP Energy respectfully requests that this Court enter judgment in its favor on all five Counts of this Complaint, and against Defendants IES (Counts I, II, IV and V), and Donald Wood (Counts III and V), and grant an award that includes:

a. The $6 million paid to settle the *Charvat* litigation;

b. The amount, to be established at trial, paid to the mediator and AEP Energy's experts in connection with the *Charvat* litigation;

c. The amount, to be established at trial, paid in connection with the confirmatory discovery conducted by plaintiff's counsel in the *Charvat* litigation;

d. The total of attorney's fees and costs, in an amount to be determined at trial, that AEP Energy has incurred and paid in connection with the *Charvat* litigation and in connection with bringing the instant lawsuit;

e. An amount, to be determined at trial, to compensate AEP Energy for the profits it reasonably expected to earn from customers who were brought to it by IES, but who IES solicited away from AEP Energy on behalf of a competitor;

f. A declaration that IES's conduct in marketing to AEP Energy customers who IES brought to AEP Energy is a violation of the OBCCA-Commercial;

g. A permanent injunction barring IES and Wood from marketing to, or soliciting business from, any commercial customer who IES brought to AEP Energy and/or for whose business IES received any payment or commission from AEP Energy;

h. Punitive and exemplary damages for the tortious conduct of Wood, Manning and IES;

i. Such other damages are established by the evidence; and

       j.   Such other relief as this Court deems just and proper.

Dated: June 19, 2015                  Respectfully submitted,

                                          AEP ENERGY, INC.

                                      By:  /s/ James L. Thompson           
                                              One of Its Attorneys

James L. Thompson
Lynch Stern Thompson LLP
150 S. Wacker Drive, Suite 2600
Telephone: (312) 346-1600
Facsimile: (312) 896-5883
Email: jthompson@lstllp.com