**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **AEP ENERGY, INC.,** an Illinois corporation, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**INFINITY MARKETING GROUP,** d/b/a **INFINITY ENERGY SOLUTIONS** )<br>)<br>Defendant. )<br>) | Case No.: 15 CV 5485<br>Judge Milton I. Shadur |

**FIRST AMENDED COMPLAINT**

Plaintiff AEP Energy, Inc. ("AEP Energy"), for its complaint against Infinity Marketing Group, d/b/a Infinity Energy Solutions ("IES") alleges and states as follows:

**Nature of the Claims**

1. AEP Energy is a retail energy supplier. Among other ventures, AEP Energy is a Certified Retail Electric Service provider that supplies electricity to residential and business customers in various deregulated electricity markets.

2. In order to pursue potential residential and business clients in deregulated markets, AEP Energy committed to the terms of two separate contracts – one for residential customers and one for commercial customers – with Defendant IES.

3. IES is a company that provides telemarketing services. IES operated a telemarketing call center, purporting to have particular expertise marketing energy services.

4.      AEP Energy brings this action because IES has breached the terms of both the residential and commercial services contracts, and failed to live up to its contractual indemnification obligations, causing injury to AEP Energy.

5.      IES breached the residential contract by, among other things, failing to comply with controlling regulations governing telephone marketing.  In its November 2012 contract with AEP Energy for residential customers, IES expressly commits to comply with all federal, state and local laws and regulations applicable to IES's calls.  IES also expressly promises that its calls to residential numbers will "not violate federal or state do-not-call rules and regulations."

6.      In April 2014, Phillip Charvat sued AEP Energy under the federal Telephone Consumer Protection Act ("TCPA"), on behalf of himself and a putative class.  Charvat alleged that he and other class members received marketing calls on behalf of AEP Energy on residential phone numbers that had been registered on the federal Do-Not-Call list, in violation of the TCPA. IES made those calls, and IES ultimately conceded that it had not been screening numbers against the federal Do-Not-Call list.

7.      Facing potential TCPA liability of up to $500 per offending call, AEP Energy settled the *Charvat* litigation for six million dollars.  Because IES' breach of the contract caused the alleged TCPA violations, IES must make AEP Energy whole for the settlement payment and for the attorneys' fees and other costs AEP Energy incurred in responding to the *Charvat* litigation. In addition, IES is contractually obligated to indemnify AEP Energy for the costs of the settlement, including attorneys' fees, under the terms of an indemnification provision in the contract.

8.      IES has also the breached separate contract governing telemarketing to commercial customers.  Under that agreement, IES commits that it will not solicit business from commercial customers it brought to AEP Energy.  Since termination of the commercial contract as of August

2014, however, IES has breached that contract by soliciting – on behalf of other energy companies – commercial customers that IES brought to AEP Energy.

## Jurisdiction and Venue

9. This Court has jurisdiction over all claims in this Complaint pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between plaintiff AEP Energy and IES, and because the amount in controversy exceeds $75,000.

10. Venue is appropriate in this Court under 28 U.S.C. § 1391(b) (2) because a substantial part of the events giving rise to the claim occurred in this District.

## The Parties

11. Plaintiff AEP Energy, Inc. is an Illinois corporation with its principal place of business in Chicago, IL. For purposes of diversity jurisdiction, it is a citizen of Illinois.

12. Defendant Infinity Marketing Group, Inc., d/b/a Infinity Energy Solutions, is a Florida corporation with its principal place of business in Pinellas County, Florida. For purposes of diversity jurisdiction, IES is a citizen of Florida.

## Substantive Allegations

**A.    The Parties and the Industry**

13. For most of the 20th Century, electricity was a heavily regulated commodity. For the most part, individuals and businesses were required to purchase their electricity from a single supplier. Each municipality had one electrical utility, and all residents of that municipality – individual citizens and commercial enterprises – generally were obligated to purchase their electricity from that municipal utility.

14. In the late 20th and early 21st centuries, certain utility markets were de-regulated. This means that, in those deregulated markets, a consumer – whether individual or business – has

the choice between continuing to buy power from the local utility, or purchasing electricity from a retail energy supplier.

15.     Plaintiff AEP Energy was created, and is still operated, to offer retail energy to customers in deregulated markets.

16.     Like several participants in the retail power marketing industry, AEP Energy does not operate its own call center with dedicated telemarketing representatives. Rather, it seeks to find and associate with skilled, ethical telemarketing companies, preferably with experience in the retail power markets.

17.     In 2012, AEP Energy personnel reached out to IES about the possibility of contracting to market AEP Energy services to residential customers in the deregulated markets in Ohio. At that time, IES representatives, including its President, Don Wood, held IES out as an experienced, trustworthy telemarketer serving deregulated electricity markets. As recently as June of 2015, IES' website continues to proclaim that IES is a skilled and reliable telemarketing partner for energy retailers:

> At Infinity Energy Solutions, we have a 165-seat top-notch call center with the best quality agents from the greater Tampa Bay Area, currently enrolling up to 1000 residential customers daily and up to 12 million kilowatts weekly! IES has been incorporated for over 10 years and has been involved in a number of call centers in and around the greater Tampa Bay Area as well. We have data down to a science and can assure you we will not be a big headache. We have TPV contracts, scripts and ftp sites on the shelf to make things easy and turn key for you. Compliant sales scripts, verification scripts and rebuttals on hand are sufficient and will meet your needs to a tee. We specialize exclusively in residential and commercial customer acquisition campaigns, and have a top-notch firm with a proven track record of success, growth and integrity. IES has facilities, capitol, management and experience to grow as a vendor, which in turn will help your company increase its customer base fast and effectively. Here we record every single call start to finish, and are completely transparent, meaning that you have the ability to access any call generated on your enrollment campaign. Our company takes pride in the quality of each and every member of our professional team, from agents to top-level executives, and we will carry ourselves a cut above the rest, time and time again.

IES website, http://www.infinityenergysolutions.com/about.html.

18. The IES website also identified those markets in which IES offers services. One such market is Illinois, in which IES purported to offer "Electricity/Gas" services in Ameren and Commed (sic) territories. http://www.infinityenergysolutions.com/service.html. IES also offers services in Ohio.[1]

### B. The Contracts Between AEP Energy and IES

19. In reliance on the assurances from IES as to its expertise and reliability, in November of 2012 AEP Energy entered into a contract with IES for telemarketing to Ohio residential customers. At that time, AEP Energy and IES were already operating under a similar contract for telemarketing to commercial (business) customers in Ohio. IES had entered into that contract with an AEP Energy affiliate (BSE Solutions, LLC), and AEP Energy later assumed the contractual obligations from BSE Solutions.

20. Both the residential and the commercial contracts obligate IES to operate call centers to make outbound telemarketing calls to potential AEP Energy customers. One agreement, the Outbound Call Center Agreement, dated March 13, 2012, covers telemarketing by IES to potential *commercial* customers in Ohio, and shall be referred to herein as OBCCA-Commercial. (OBCCA-Commercial is attached as Exhibit 1.)

21. A separate but similar contract, the Outbound Telemarketing Agreement, sets forth the terms by which IES is to telemarket AEP Energy services to prospective *residential* customers in certain service territories within Ohio. That contract, dated November 5, 2012, shall be referred to herein as OBTA-Residential. (OBTA-Residential is attached as Exhibit 2.)

---

[1] It is not clear whether, since the filing of AEP Energy's initial complaint in June 2015, IES has taken down its website.

22. Pursuant to the OBTA-Residential, IES agrees to market "energy and/or energy-related services and products" to Ohio residential consumers on behalf of AEP Energy. Specifically, IES commits to undertake a telephone marketing program whereby it will reach out to Ohio residents and encourage them to enter into agreements selecting AEP Energy as their electricity supplier. IES is to receive compensation for each customer it signs up to receive AEP Energy services.

23. In exchange for the compensation it is to receive, IES assumes several duties under the OBTA-Residential. Specifically, the OBTA-Residential provides:

- IES, referred to in the OBTA-Residential as the "OBTM," agrees that all calls to prospective customers shall be made during normal business calling hours, "subject to compliance with all relevant telemarketing law, rules and regulations." OBTA-Residential, Ex. 2 at ¶ 1.

- IES guarantees that, if it supplies the leads, those leads shall be "legitimate residential phone numbers and do not violate federal or state do-not-call ('Regulatory DNC') rules and regulations." OBTA-Residential, Ex. 2 at ¶ 2. At all times while the agreement was in place, IES supplied virtually all of the leads, and 100% of the leads that were alleged to have violated Regulatory DNC rules and regulations.

- Although paragraph 1 obligates IES to comply with relevant telemarketing law, rules and regulations, the OBTA-Residential provides a broader guarantee of compliance in paragraph 9. In that provision, IES agrees that it "shall comply with all federal, state and local laws, rules, and regulations and any other governmental or quasi-governmental rules and regulations . . . in regard to the conduct of Services rendered pursuant to the Agreement." IES further commits that it "will strictly adhere to all rules and regulations applicable to telemarketing in the Service Territories." OBTA-Residential, Ex. 2 at ¶ 9.

- IES also agrees to indemnify AEP Energy if AEP Energy is damaged by reason of IES's failure to perform as promised. Specifically, IES promises to indemnify AEP Energy from any liabilities, judgments and expenses, including attorneys' fees, that arise out of claims or suits with respect to "a breach of the Agreement by OBTM [IES] or the negligent or willful acts of OBTM [IES]." OBTA-Residential, Ex. 2 at ¶ 17.

24. Both the Residential and the Commercial contracts contain a similar provision barring IES from later soliciting, on behalf of other energy providers, customers who IES initially

6

brought to AEP Energy. Specifically, under both agreements, IES promises that it "shall not directly or indirectly, either on its own behalf or on behalf of any other person or entity, attempt to persuade or solicit any customer for whose account OBTM [IES] has been paid to acquire." OBCCA-Commercial, Ex. 1 at ¶ 8, OBTA-Residential, Ex. 2 at ¶8. Under the OBCCA-Commercial, the ban on solicitation of AEP Energy customers who IES helped acquire is permanent; under the OBTA-Residential, the ban lasts for one year following termination of the customer's agreement with AEP Energy.

**C.    IES' Breach of the OBTA-Residential and the Lawsuit against AEP Energy.**

25.    Soon after the parties entered into the OBTA-Residential, IES began making calls in an effort to obtain new residential customers for AEP Energy.

26.    In telemarketing to Ohio residents, IES did not request leads from AEP Energy. Instead, IES purchased leads from one or more third party vendors.

27.    In June of 2013, while the IES program for residential customers was ongoing, the Ohio Public Utility Commission prepared and posted an electronic notice that advised Ohio residents of their right to prevent unwanted telemarketing calls by placing their telephone numbers on the National Do Not Call Registry. The post described the Do-Not-Call ("DNC") list and program, advised consumers how to register their numbers, and detailed the restrictions on telemarketers when a number has been listed on the DNC registry.

28.    AEP Energy forwarded this detailed post to IES, including to Bart Hawk, then the IES COO. On the same day he received the notice from AEP Energy, Hawk wrote back, representing that IES was well aware of the restrictions described by the Ohio Commission and reassuring AEP Energy that "we abide by all DNC and disclosure requirements."

7

29. The IES representation that it was abiding by all Do-Not-Call requirements was false.

30. On April 29, 2014, an Ohio resident named Phillip Charvat filed a class action lawsuit in the United States District Court for the Northern District of Illinois. The complaint in that lawsuit, attached hereto as Exhibit 3, alleges that telemarketing calls made by or on behalf of AEP Energy were made to Charvat on a residential telephone number that had been registered on the federal Do-Not-Call list. Charvat alleges that the calls to his registered number violated the TCPA, 47 U.S.C. § 227. Charvat alleges that similar illegal telemarketing calls were made by or on behalf of AEP Energy to hundreds of thousands or even millions of potential customers whose numbers had been registered to the DNC list. The lawsuit requests that a class of all such consumers be certified and that the class recover $500 per violation.

31. AEP Energy learned of the suit on the day, or the day after, it was filed.

32. The allegations in the complaint came as a surprise to AEP Energy. Throughout the life of the Ohio telemarketing program run by IES, AEP Energy had not received any complaints. Although, AEP Energy did receive a complaint alleging that a 2014 telemarketing call was made to a Pennsylvania resident whose number was on Pennsylvania's do-not-call list; however, that call had been made outside of Ohio by a vendor other than IES. No one had suggested to AEP Energy that IES might be disregarding the TCPA and calling numbers on the federal DNC list.

33. In response to the allegations in the *Charvat* complaint, AEP Energy took several steps. First, AEP Energy sent IES a letter that included a copy of the *Charvat* complaint and demanded that IES indemnify AEP Energy pursuant to the OBTA-Residential's indemnification clause.

34. Second, AEP Energy opened a dialogue with the lawyers representing the plaintiff and the putative class in the *Charvat* litigation. Because the TCPA allows for recovery of up to $500 per violation, without requiring any proof of actual injury, AEP Energy faced a huge theoretical liability. If the complaint was correct that there had been as many as 100,000 illegal calls, the potential exposure for AEP Energy was up to $50 million. A million violative calls would generate potential exposure of up to $500 million. In light of the potential for ruinous exposure, AEP Energy entered into early settlement discussions with the plaintiff's lawyers. AEP Energy kept IES informed of those discussions.

35. Third, AEP Energy demanded that IES provide AEP Energy with a copy of the IES call log, listing all phone numbers that IES had contacted as part of the residential telemarketing program.

36. Fourth, AEP Energy reached out to IES to discuss compliance with Do-Not-Call requirements. AEP Energy sought assurance that IES had not been violating federal law, as the *Charvat* complaint asserted. Even more importantly, AEP Energy demanded assurance that IES affirmatively would commit to scrub all future residential numbers against the federal DNC list. AEP Energy knew that it would need to shut down IES's operations on its behalf if IES was making additional calls that could expose AEP Energy to further liability.

D.  **The Termination of IES and the *Charvat* Settlement**

37. In July 2014, AEP Energy received the early results of its investigation of the IES call log, indicating that IES had been misrepresenting its behavior, and that IES had actually been making numerous calls without screening them against the federal DNC list. Eventually, IES itself conceded that it had called hundreds of thousands of residential phone numbers that were contained on the then-current federal DNC list.

9

38. Also in July 2014, AEP Energy learned for the first time that IES had failed to comply with Ohio law requiring all telemarketers to register with the State. IES attempted to make a hurried, after-the-fact registration, but that could not alter the fact that IES had been marketing without a license to Ohio residents and businesses since 2012. In light of these material breaches of both the OBTA-Residential and the OBCCA-Commercial, AEP Energy terminated both contracts and ceased remitting payments to IES. AEP Energy terminated the contracts pursuant to the termination provisions. Ex. 1, OBCCA-Commercial at ¶ 4, Ex. 2, OBTA-Residential at ¶ 4.

39. Early in the *Charvat* litigation AEP Energy agreed with class counsel to participate in mediation before a retired federal magistrate judge. AEP's investigation of the IES call logs suggested that IES's behavior had exposed AEP Energy to a potential, theoretical liability of up to $500,000,000, although AEP Energy had many arguments and defenses that could, if accepted, reduce or eliminate that exposure. In that mediation, AEP sought to negotiate the best deal possible -- one that allowed it to survive by eliminating the possibility of a judgment in the hundreds of millions of dollars. AEP Energy kept IES informed of its thinking, and informed it in advance of the mediation.

40. With the mediator's help, the parties ultimately agreed upon a $6 million settlement, funded entirely by AEP Energy. That settlement agreement has been signed and finally approved by the federal judge presiding over the *Charvat* litigation.

## COUNT I
## BREACH OF THE OBTA-RESIDENTIAL

41. As paragraph 41, AEP Energy restates and adopts paragraphs 1-40 as if set forth here fully.

42. At all times prior to termination of that agreement, the OBTA-Residential was a binding and enforceable contract between IES and AEP Energy.

10

43. By engaging in an outbound telemarketing program to Ohio residents that failed to screen numbers against the national Do-Not-Call Registry, IES committed material breaches of the OBTA-Residential by:

    a. Failing to comply with all relevant telemarketing law, rules and regulations;

    b. Employing leads procured by IES, without ensuring that the IES calls to those numbers did not violate federal or state do-not-call rules and regulations;

    c. Failing to comply with all federal, state and local laws, rules and regulations applicable to the offering of AEP Energy services; and

    d. Failing to adhere strictly to all rules and regulations applicable to telemarketing in the service territories covered by the OBTA-Residential.

44. As a direct and proximate result of the IES breaches of the OBTA-Residential, AEP Energy has suffered damages, including but not limited to:

    a. The $6 million paid to settle the *Charvat* litigation;

    b. The mediation fees paid by AEP Energy;

    c. The fees AEP Energy paid to experts to assist in reviewing IES's call logs and IES's non-compliant conduct of the telemarketing program;

    d. The costs of confirmatory discovery in the *Charvat* litigation; and

    e. The other costs and attorney's fees AEP Energy incurred in connection with the *Charvat* litigation and in bringing this action.

### COUNT II
### CONTRACTUAL INDEMNIFICATION

45. As paragraph 45, AEP Energy restates and adopts paragraphs 1-44 as if set forth here fully.

46. The OBTA-Residential contains an enforceable indemnification provision. Paragraph 17 of that agreement, entitled "**Indemnification**," states in relevant part:

> OBTM [IES] shall indemnify and hold harmless AEP Energy from and against any and all liabilities, judgments and expenses, including attorney's fees, arising out of

11

any claims, suits or proceeding brought before any court, arbitrator, administrative, governmental or industry self-regulatory body or other tribunal with respect to . . . a breach of the terms of the Agreement by OBTM or the negligent or willful acts of OBTM. Ex. 2 at ¶ 17.

47. The *Charvat* lawsuit is a "claim, suit or proceeding" for purposes of the indemnification provision.

48. The allegations in the *Charvat* lawsuit seek to impose liability against AEP Energy based on a breach of the OBTA-Residential by IES and/or on the negligent or willful acts of IES.

49. AEP Energy has sent timely notices to IES informing IES of AEP Energy's entitlement to and demand for indemnification under the contract.

50. AEP Energy is entitled to indemnification from IES pursuant to the OBTA-Residential, indemnifying AEP Energy for the following liabilities, judgments and expenses:

  a. The $6 million paid to settle the *Charvat* litigation;

  b. The mediation fees paid by AEP Energy;

  c. The fees AEP Energy paid to experts to assist in reviewing IES's call logs and IES's non-compliant conduct of the telemarketing program;

  d. The costs of confirmatory discovery in the *Charvat* litigation; and

  e. The other costs and attorney's fees AEP Energy incurred in connection with the *Charvat* litigation and in bringing this action.

**E. The Ongoing, Post-Termination Breaches by IES**

51. When AEP Energy terminated the contracts with IES in July 2014, AEP Energy ensured that it would no longer be liable, under the TCPA, for IES's illegal telemarketing programs. That termination did not, however, put an end to IES' violative conduct.

52. Both the OBCCA-Commercial and the OBTA-Residential impose continuing obligations on IES even after contract termination. Specifically, paragraph 8 of the OBCCA-Commercial, entitled **"Limitation on Use of Customer Information; Exclusivity,"** states that

IES "shall not directly or indirectly, either on its own behalf or any other person or entity, attempt to persuade or solicit any customer for whose accounts OCC [IES] has been paid to acquire" for AEP Energy. The OBTA-Residential has a similar prohibition.

53. Additionally, both contracts include a virtually identical paragraph 14, labeled "Confidentiality." That provision establishes that all information that AEP Energy provides to IES about AEP Energy business, and all information that IES develops or learns during the course of performing the contract, is protected, Confidential Information. IES commits that it will not disclose, use or maintain such AEP Energy Confidential Information, except as necessary to its performance of its obligations under the agreements. Ex. A, OBCCA-Commercial at ¶ 14; Ex. B, OBTA-Residential at ¶ 14.

54. The prohibition against soliciting customers brought to AEP Energy, and the Confidentiality provision, are vital to protecting AEP Energy's confidential customer information. Through its work for AEP Energy, IES was able to learn critical information about the commercial customers it signed up for AEP Energy, including the customers' identities, the termination dates of their electrical supply contracts, and the prices being paid for energy. Without the protections of Paragraphs 8 and 14, IES could simply stop working for AEP Energy and immediately begin poaching AEP Energy's clients for another energy supply company.

55. This is precisely what IES has done. Since the termination of its relationship with AEP Energy, IES has been using the precise information protected by Paragraphs 8 and 14 of the OBCCA-Commercial on behalf of other energy suppliers. On at least three separate occasions about which AEP Energy is aware, IES has approached AEP Energy customers on behalf of other suppliers and encouraged those customers to leave AEP Energy. IES is aware of these customers'

identities, of the end-dates of their existing supply contracts, and of the prices they currently are paying for electricity, solely because of the work IES did on behalf of AEP Energy.

56. On information and belief, IES has gone so far as to design a specific program to identify, target, and contact existing AEP Energy customers. IES is using scripts that say, in substance, "I am calling on behalf of IES. Some months ago we enrolled you with AEP Energy. Our records reflect that your contract is up for renewal and expires on [date]. We have a great offer for you on behalf of [Competitor to AEP Energy]."

## COUNT III
## BREACH OF THE OBCCA-COMMERCIAL

57. As paragraph 57, AEP Energy restates and adopts paragraphs 1-56 as if set forth here fully.

58. The OBCCA-Commercial is a binding and enforceable contract between the parties.

59. Although the OBCCA-Commercial was effectively terminated as of August 1, 2014, Paragraphs 8 and 14 of that agreement impose ongoing duties on IES.

60. According to Paragraph 8, IES may not solicit business from commercial customers it successfully acquired for AEP Energy. According to Paragraph 14, IES may not use AEP Energy's Confidential Information for any purpose other than providing AEP Energy Invoices under the OBCCA-Commercial.

61. IES has breached Paragraphs 8 and 14 of the OBCCA-Commercial by offering, to AEP Energy customers that were acquired for it by IES, energy services on behalf of AEP Energy competitors.

62. The conduct of IES has caused direct and proximate injury to AEP Energy, in an amount to be determined at trial, by causing AEP Energy to lose the future business of existing customers, by injuring AEP Energy's reputation, and by denying AEP Energy the benefit of the commissions it paid to IES for customer acquisition services in 2012-2014.

63. Unless the breaches of contract are enjoined, AEP Energy will continue to suffer injury into the future. The full extent of that injury is not knowable because AEP Energy does not know how many and which customers are receiving the improper solicitations from IES.

**WHEREFORE**, Plaintiff AEP Energy respectfully requests that this Court enter judgment in its favor on all Counts of this Complaint against IES, and grant an award that includes:

a. The $6 million paid to settle the *Charvat* litigation;

b. The amount, to be established at trial, paid to the mediator and AEP Energy's experts in connection with the *Charvat* litigation;

c. The amount, to be established at trial, paid in connection with the confirmatory discovery conducted by plaintiff's counsel in the *Charvat* litigation;

d. The total of attorney's fees and costs, in an amount to be determined at trial, that AEP Energy has incurred and paid in connection with the *Charvat* litigation and in connection with bringing the instant lawsuit;

e. An amount, to be determined at trial, to compensate AEP Energy for the profits it reasonably expected to earn from customers who were brought to it by IES, but who IES solicited away from AEP Energy on behalf of a competitor;

f. A declaration that IES's conduct in marketing to AEP Energy customers who IES brought to AEP Energy is a violation of the OBCCA-Commercial;

g. A permanent injunction barring IES from marketing to, or soliciting business from, any commercial customer who IES brought to AEP Energy and/or for whose business IES received any payment or commission from AEP Energy;

h. Such other damages as are established by the evidence; and

i. Such other relief as this Court deems just and proper.

Dated: November 12, 2015	Respectfully submitted,

                                          AEP ENERGY, INC.

                                          By: /s/ James L. Thompson
                                                One of Its Attorneys

James L. Thompson
Lynch Stern Thompson LLP
150 S. Wacker Drive, Suite 2600
Telephone: (312) 346-1600
Facsimile: (312) 896-5883
Email: jthompson@lstllp.com