IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AEP ENERGY, INC., an Illinois corporation,<br><br>   Plaintiff,<br> v.<br><br>INFINITY MARKETING GROUP, d/b/a<br>INFINITY ENERGY SOLUTIONS<br><br>   Defendant. | Case No.: 15 CV 5485<br><br>Judge Milton I. Shadur |

**PLAINTIFF AEP ENERGY, INC.'S ANSWERS AND AFFIRMATIVE DEFENSES TO DEFENDANT INFINITY MARKETING GROUP'S COUNTERCLAIMS**

Plaintiff AEP Energy ("AEP-E") answers the Counterclaim of Defendant Infinity Marketing Group, d/b/a Infinity Energy Solutions ("IES") as follows:

**COUNTERCLAIM**

Defendant/Counter-Plaintiff Infinity Marketing Group, d/b/a Infinity Energy Solutions ("IES") brings this Counterclaim against Plaintiff/Counter-Defendant AEP Energy, Inc. ("AEP") for breach of contract, tortious interference with business relationships, defamation, unfair competition, violation of the Illinois Deceptive Trade Practices Act. In support thereof, IES alleges the following:

**Jurisdiction**

1. This Court has jurisdiction over IES's Counterclaims pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. The Court also has jurisdiction over the Counterclaims pursuant to 28 U.S.C. § 1367(a), as they are related to the allegations of AEP's Complaint and form part of the same case or controversy.

1

**ANSWER**: Plaintiff AEP Energy ("AEP-E") admits that this Court has jurisdiction over the IES Counterclaim pursuant to 28 U.S.C. 1367(a) and that the parties are citizens of different states. AEP-E denies that IES has a plausible claim for damages in excess of $75,000.

### Factual Background

*AEP's Failure to Make Payments Owed under the Parties' Contracts.*

2. Formed in 2002, IES is a marketing company that, *inter alia*, provides telemarketing services for retail energy companies in deregulated electricity markets. *Id.* ¶¶ 3, 19. Between March 2012 and July 2014, IES marketed AEP's services to prospective residential and commercial customers in Ohio through the outbound telemarketing services IES provided.

**ANSWER**: AEP-E lacks information as to the date of IES's formation or as to the full range of services that IES provides, and therefore denies those allegations. AEP-E admits the remaining allegations of Paragraph 2.

3. Between March 2012 and July 2014, IES marketed AEP's services to prospective residential and commercial customers in Ohio through the outbound telemarking services IES provided.

**ANSWER**: AEP-E admits that, pursuant to the two Contracts attached to the Amended Complaint, IES committed to perform outbound telemarketing services, but denies that IES provided those services in conformance with the terms of the Contracts.

4. IES provided its services to AEP pursuant to contracts the parties entered into in 2012. In March 2012, IES entered into an "Outbound Call Center Agreement" with BSE Solutions LLC ("BSE"), to provide BSE with outbound telemarketing services to prospective commercial customers ("Commercial Contract.") (*See* Dkt. No. 1, Cmpl., Ex. 1.) AEP alleges that BSE is its affiliate and that AEP has assumed the contractual obligations of BSE under the contract.

**ANSWER**: AEP-E admits that, pursuant to the two Contracts attached to the Amended Complaint, IES committed to perform outbound telemarketing services, but denies that IES provided those services in conformance with the terms of the Contracts. AEP-E admits the remaining allegations of Paragraph 4.

5. In November 2012, IES entered into a similar contract with AEP to provide

2

outbound telemarketing services to prospective customers ("Residential Contract"). (*Id.*, Ex. 2.)

**ANSWER**: AEP-E admits that AEP-E and IES entered into the Residential Contract in November 2012, under which IES was to provide outbound telemarketing services to prospective residential customers, in compliance with all relevant telemarketing law, rules and regulations. AEP-E admits the remaining allegations of Paragraph 5.

      6.      With respect to AEP's payment obligations for the services IES rendered, the Residential Contract provides the following:

> For the Services to be furnished by OBTM [*i.e.*, IES] to AEP Energy, AEP Energy agrees to pay OBTIM as described below. No additional charges other than those specified herein will be paid by AEP Energy to OBTM unless agreed to by both parties in writing."
>
> The total amount of all Commission Payments (as hereinafter defined) (each, a "Monthly Commission Payment") shall be made on a weekly basis for such Customers obtained once the following requirements are met: (a) A valid third party verification ("TPV") has been received from TPV vendor and approved through audit process; (b) Customer has passed AEP Energy's credit check, if applicable and (c) Customer's enrollment has been accepted by the host utility.

(Dkt. No. 1, Cmplt., Ex. 2, ¶ 3.)

**ANSWER**: AEP-E admits the allegations of Paragraph 6, but directs the Court to the entire Residential Contract for the complete terms of that agreement.

      7.      The Commercial Contract, in turn, provides that:

> For the services to be furnished by OCC [defined by the contract to be IES] . . . [AEP] agrees to pay OCC as described below. Unless otherwise agreed to in writing by the parties, these payments shall be made by [AEP] to OCC within 15 days of receipt of invoices from OCC . . . .
>
> Within 15 days of each month's end during the term of this Agreement, [AEP] shall also pay OCC an amount of all Commission Payments (as hereinafter defined) earned during the previous calendar month (each, a "Monthly Commission Payment").

(*See* Dkt. No. 1, Ex. 1 ¶ 3.)

**ANSWER**: AEP-E admits the allegations of Paragraph 7, but directs the Court to the entire Commercial Contract for the complete terms of that agreement.

8. IES performed outbound telemarketing services for AEP from the dates of the Contracts until July 2014.

**ANSWER**: AEP-E admits that IES purported to perform outbound telemarketing services, but denies that IES provided those services in conformance with the terms of the Contracts.

9. AEP made the weekly and monthly payments it owed IES under the Contracts for the services IES rendered until approximately June 2014.

**ANSWER**: AEP-E admits that, until approximately 2014, it believed that IES was performing services in accordance with the terms of the Contracts, and therefore made the weekly and monthly payments that are associated with sales under the Contracts.

10. In June 2014, AEP stopped making payments it owed for IES' services, failing to make any of the weekly commission payments it owed under the Residential Contract, or the monthly payments it owed IES under the Commercial Contract. As a result, AEP's account with IES fell into arrears by over $300,000.

**ANSWER**: AEP-E admits that, after it was sued for violations of federal law that IES committed in marketing AEP-E services under the Contracts, in violation of the Contracts' terms, AEP-E withheld payment while it investigated IES' compliance with the Contracts. AEP-E denies the remaining allegations of Paragraph 10.

11. Despite AEP's non-payment, IES continued to provide AEP the telemarketing services for which AEP had contracted. IES nevertheless informed AEP that, unless its account was brought up to date, IES would have no choice but to terminate its services under the Contracts.

**ANSWER**: AEP-E admits that IES refused to provide the IES call log and threatened to stop performing under the Contracts unless AEP-E made immediate payments, before AEP-E had an opportunity to determine whether IES' previous and ongoing performance complied with the

Contracts. Answering further, AEP-E asserts that it made the payments demanded by IES only after IES falsely represented that it would ensure that all future calls were to numbers not on the federal Do-Not-Call list and that IES's future performance would comply with all governing laws and regulations. AEP-E denies that, from June 2014 forward, IES provided the telemarketing services for which AEP-E had contracted.

12. On July 2, 2014, AEP made the outstanding payments it owed IES.

**ANSWER**: AEP-E admits that it made payments to IES on July 2, 2014, but denies that those payments were properly outstanding.

13. At the time it terminated the Contracts, AEP owed IES approximately $316,000 for services IES had rendered prior to AEP's termination of the Contracts.

**ANSWER**: AEP-E denies the allegations of Paragraph 13.

14. Despite several demands by IES, AEP has refused to pay IES the amounts it owes under the Contracts.

**ANSWER**: AEP-E admits that it has not paid any of the amounts IES claims to be owed, but otherwise denies the allegations of Paragraph 14.

*AEP's Campaign to Destroy IES and Put it out of Business.*

15. After cancelling the parties' Contracts, AEP engaged in a campaign of unlawful misconduct intended to put IES out of business by defaming IES, and interfering with its contractual and prospective business relationships**.**

**ANSWER**: AEP-E denies the allegations of Paragraph 15.

16. In 2015, prior to the parties' present lawsuit, AEP contacted several of IES customers (*i.e.*, other retail energy suppliers with whom IES has similar outbound telemarking agreements) and falsely accused IES of using AEP's confidential information to solicit AEP customers, threatened the customers with legal action that AEP knew it did not have a good faith basis for and did not intend to pursue, and falsely disparaged and informed the customers that, by continuing to do business with IES, they would potentially face hundreds of millions of dollars in potential liability.

**ANSWER**: AEP admits that, in 2015, it contacted two retail energy suppliers on whose behalf

5

IES was using confidential AEP-E information to make customer solicitations that violated the terms of the Contracts. AEP-E denies the remaining allegations of Paragraph 16.

17. On March 31, 2015, attorneys for AEP sent a letter to a customer of IES, Nordic Energy Services, that falsely accused IES of using confidential AEP information to "solicit[e] existing AEP Energy customers on behalf of Nordic." AEP claimed in the letter, without any factual basis and contrary to what it knew to be true, that IES was "well aware that these [were] customers that IES acquired for AEP Energy," and that "[n]ow that AEP Energy is no longer doing business with IES, it is apparent that IES is using information about AEP Energy's customers, derived from IES's performance under its contract with AEP Energy, in order to benefit a party other than AEP Energy – Nordic."

**ANSWER**: AEP-E admits that its counsel sent a letter to Nordic Energy Services in 2015, and refers to the text of that letter for its contents. AEP-E denies the remaining allegations of Paragraph 17.

18. The March 31 letter further asserted that: "IES's solicitation of AEP Energy Customers, and its use of the information about those customers derived from its performance of services for AEP Energy, represent breaches of IES's Outbound Call Center Agreement with AEP Energy, and tortious interference with AEP Energy's contractual relationships and business expectancies with its existing customers."

**ANSWER**: AEP-E admits that its counsel sent a letter to Nordic Energy Services in 2015, and refers to the text of that letter for its contents.

19. AEP's claim that IES had breached the Contracts and tortuously inferred with AEP's customer-relationships by using confidential information to solicit AEP customers were knowingly false and/or made with reckless disregard for their truth. AEP knew at the time the statements were made that IES had made hundreds of thousands of calls to prospective customers on AEP's behalf over their course of their relationship, that information regarding sales made by IES was maintained and controlled by AEP, and that IES did not maintain its own records of the sales it made on AEP's behalf, which sales were confirmed by AEP's third-party vendor following the initial call, or the names or phone numbers of the customers for which AEP had compensated IES.

**ANSWER**: AEP-E denies the allegations of Paragraph 19.

20. Threatening litigation, the March 31 letter informed Nordic that AEP would "view acceptance of future business with AEP Energy customers, brought to you by IES, as tortious interference with our contractual and business relationships," and "demand[ed] that Nordic take all reasonable steps to ensure that IES does not continue to engage in unlawful and improper conduct to benefit Nordic."

**ANSWER**: AEP-E admits that its counsel sent a letter to Nordic Energy Services in 2015, and refers to the text of that letter for its contents. AEP-E denies the remaining allegations of Paragraph 20.

21. AEP made the above statements to Nordic and, as alleged below, other IES customers for the sole and unlawful purpose of injuring IES by threatening and coercing Nordic and its other customers to diminish or cease doing business with IES. AEP knew at the time it sent the March 31 letter that it did not have a good faith basis for pursuing litigation against Nordic, and that it did not intend to do so.

**ANSWER**: AEP-E denies the allegations of Paragraph 21.

22. The March 31 letter, however, did not end with just threats of litigation by AEP. It falsely disparaged IES's professional knowledge, ability and integrity, and advised Nordic that, by "continuing to engage IES," it was subjecting itself to hundreds of millions of dollars of potential liability. Referring to the allegations against AEP in the *Charvat* litigation, the letter stated:

> Under the TCPA, each violative call can lead to a statutory award of up to $500. . . although IES had made a contractual commitment to comply with all laws and regulations and had expressly committed to scrub its call lists against the Do Not Call list, we uncovered evidence suggesting that IES had ignored its obligations and had called thousands of numbers that are listed on the [DNC] list. AEP is now working on a costly settlement of that lawsuit, and Nordic may be assuming similar or even greater risks by continuing to engage IES.

**ANSWER**: AEP-E admits that its counsel sent a letter to Nordic Energy Services in 2015, and refers to the text of that letter for its contents. AEP-E denies the remaining allegations of Paragraph 22.

23. AEP's statements to Nordic that it had "uncovered evidence" that IES "ignored its obligations" to "scrub its call list" against the DNC, and that Noric risked potential liability of hundreds of millions of dollars if it continued to do business with IES were knowingly and intentionally false, were unjustified, and were made for sole purpose of inducing Nordic to terminate its contract with IES.

**ANSWER**: AEP-E denies the allegations of Paragraph 23.

24. Within three weeks of receiving the March 31 letter, Nordic terminated its contract with IES contract and severed all ties between the parties.

**ANSWER**: AEP-E lacks information as to the allegations of Paragraph 24 and therefore denies them.

25. Upon information and belief, AEP sent similar letters to other customers of IES.

**ANSWER**: AEP-E denies the allegations of Paragraph 25.

26. Eligo Energy, for example, entered into a contract with IES for IES to provide outbound telemarketing services for its retail energy products. In early 2015, Eligo notified IES that it had received a letter from AEP threatening to sue Eligo if it continued to do business with IES. Over the weeks that followed, Eligo informed IES that it received two other communications from AEP, that it had spoken with AEP's attorney (the same attorney representing AEP in this action) and, based on the conversation, it was clear to Eligo that AEP was "out to get" IES, that the situation was costing Eligo substantial legal fees, and that Eligo did not want to be sued by AEP. Almost immediately thereafter, Eligo effectively terminated its relationship with IES by artificially inflating the prices it quoted IES in excess of the market so that IES could no longer service the parties' contract.

**ANSWER**: AEP-E admits that it sent a letter to Eligo Energy in 2015. AEP-E lacks information as to the remaining allegations of Paragraph 26 and therefore denies them.

27. During the same period of time, other customers, including Discount Energy, also unexpectedly and without explanation terminated what had been established and successful relationships with IES.

**ANSWER**: AEP-E lacks information as to the allegations of Paragraph 27 and therefore denies them. AEP-E has had no communications with Discount Energy relating to IES.

28. In addition, AEP engaged in a media campaign designed to smear the reputation and defame IES – and succeeded. Among other statements that were published throughout the industry, AEP falsely stated that, "Infinity, a vendor making outbound calls for AEP Energy, called customers on the [do not call] list without AEP Energy's authority or knowledge." The statement was published on or about June 25, 2015. Upon information and belief, AEP falsely stated that "Infinity admitted to AEP that it never scrubbed its calling list against the federal Do Not Call list." That statement was published on or about June 26, 2015. In yet another statement that was published on or about July 18, 2015, AEP's spokesperson falsely stated that "Once AEP Energy's investigation confirmed that the vendor was acting in violation of the contract, we stopped doing business with them."

**ANSWER**: AEP-E admits that the first and third quotations are part of a larger statement issued by AEP-E in response to inquiries related to its filing of the instant lawsuit, but denies that those

8

statements are false.  AEP-E denies the remaining allegations of Paragraph 28.

29. These and other statements were distributed by AEP and its agents in media outlets and the internet including:  The Columbus Dispatch, Retail EnergyX, and the Olshan Law Advertising Blog.

**ANSWER**:  AEP-E lacks information as to all of the locations in which statements attributed to AEP-E may have been repeated, and therefore denies the allegations of Paragraph 29.

30. As a result of AEP's unlawful actions, IES suffered significant damages in the form of lost business and revenues and other injury that jeopardizes the ability of the company to stay in business.

**ANSWER**:  AEP-E denies the allegations of Paragraph 30.

## COUNT I
## BREACH OF CONTRACT

31. IES incorporates paragraphs 1-30 of its Counterclaims as if fully set forth herein.

**ANSWER**:  As its answer to paragraph 31, AEP-E repeats and incorporates its answers to Paragraphs 1-30.

32. Between March 2012 and July 11, 2014, IES provided services to AEP pursuant to the parties' valid and enforceable Contracts.

**ANSWER**:  AEP-E admits that IES purported to perform outbound telemarketing services between March 2012 and July 11, 2014, but denies that IES provided those services in conformance with the terms of the Contracts.

33. The Residential Contract required that all monthly commission payments owed to IES for the services it rendered by made on a weekly basis.  The Commercial Contract required that monthly commission payments owed to IES be made on a monthly basis.

**ANSWER**:  AEP-E admits the allegations of Paragraph 33, so long as the services IES provided were in accord with the terms of the Contracts.

34. At the time it terminated the Contracts, AEP owed IES approximately $153,725 in commission payments under the Residential Contract for customers IES had obtained for AEP between June 6, 2014 through July 11, 2014.

**ANSWER**: AEP-E denies the allegations of Paragraph 34.

35. At the time it terminated the Contracts, AEP owed IES approximately $162,372 in commission payments under the Commercial Contract for customers IES obtained for AEP from June 2, 2014 through July 11, 2014.

**ANSWER**: AEP-E denies the allegations of Paragraph 35.

36. AEP's failure to pay these amounts due and owing is a breach of the Parties' Contracts, causing IES to suffer damages of at least $316,097.

**ANSWER**: AEP-E denies the allegations of Paragraph 36.

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

37. IES incorporates paragraphs 1-30 of its Counterclaims as if fully set forth herein.

**ANSWER**: As its answer to paragraph 37, AEP-E repeats and incorporates its answers to Paragraphs 1-30.

38. At all times relevant hereto, a valid and ongoing contractual and/or business relationship existed between IES and its customers, including Nordic Energy, Eligo Energy, Discount Energy, among others.

**ANSWER**: AEP-E lacks information as to the allegations of Paragraph 38 and therefore denies them.

39. AEP was aware of IES' ongoing relationships with these customers.

**ANSWER**: AEP-E denies the allegations of Paragraph 39.

40. By its wrongful, intentional and unjustified acts, AEP sought to induce and did induce IES customers, including Nordic Energy, Eligo Energy, and Discount Energy to end their contractual and/or business relationships with IES.

**ANSWER**: AEP-E denies the allegations of Paragraph 40.

10

41. IES had established relationships with its customers prior to AEP's unlawful interference, having invested substantial amounts of time and resources into developing those relationships. IES had a reasonable expectation that those relationships would have continued in the future, but for AEP's unlawful conduct.

**ANSWER**: AEP-E lacks information as to the allegations of Paragraph 41 and therefore denies them.

42. IES was substantially damaged as a direct result of AEP's wrongful conduct, suffering substantial losses in revenue that caused the company's demise.

**ANSWER**: AEP-E denies the allegations of Paragraph 42.

## COUNT III
## DEFAMATION

43. IES incorporates paragraphs 1-30 of its Counterclaims as if fully set forth herein.

**ANSWER**: As its answer to paragraph 43, AEP-E repeats and incorporates its answers to Paragraphs 1-30.

44. AEP's false and misleading statements to IES' customers and the general public regarding the *Charvat* litigation, that IES had "ignored its obligations" under the TCPA, and that it had misappropriated confidential information to solicit AEP's customers constitute trade libel and commercial disparagement.

**ANSWER**: Paragraph 44 contains primarily legal conclusions, to which no response is necessary or appropriate. To the extent that Paragraph 44 is construed as alleging facts, AEP-E denies them.

45. AEP's defamatory statements were made with the malicious intent of destroying IES and putting the company out of business. Its unlawful conduct damaged IES's reputation in the trade, unlawfully interfered with IES' customer relationships, and directly caused IES to suffer actual and substantial damages in the form of lost revenue and the demise of the company.

**ANSWER**: AEP-E denies the allegations of Paragraph 45.

## COUNT IV
## UNFAIR COMPETITION

46. IES incorporates paragraphs 1-30 of its Counterclaims as if fully set forth herein.

**ANSWER**: As its answer to paragraph 46, AEP-E repeats and incorporates its answers to

11

Paragraphs 1-30.

47. AEP's intentional and unjustified interference with IES' business relationships and defamatory statements constitute unfair competition.

**ANSWER**: Paragraph 47 contains primarily legal conclusions, to which no response is necessary or appropriate. To the extent that Paragraph 47 is construed as alleging facts, AEP-E denies them

48. AEP engaged in its unlawful conduct with the malicious intent of destroying IES and putting the company out of business. Its unlawful conduct damaged IES's reputation in the trade, unlawfully interfered with IES' customer relationships, and directly caused IES to suffer actual and substantial damages in the form of lost revenue and the demise of the company.

**ANSWER**: AEP-E denies the allegations of Paragraph 48.

## COUNT V
## UNIFORM DECEPTIVE TRADE PRACTICES ACT

49. IES incorporates paragraphs 1-30 of its Counterclaims as if fully set forth herein.

**ANSWER**: As its answer to paragraph 49, AEP-E repeats and incorporates its answers to Paragraphs 1-30.

50. AEP's false and misleading statements to IES' customer disparage IES' services or business in violation of Section 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2.

**ANSWER**: AEP-E denies the allegations of Paragraph 50.

51. Pursuant to the Act, IES seeks injunctive relief, restraining AEP from making false and misleading statements to IES' customers.

**ANSWER**: AEP-E admits that Paragraph 51 describes the relief that IES seeks, but denies that IES is entitled to that or any relief, and denies that any false or misleading statements were made to IES' customers.

**WHEREFORE**, Infinity Marketing Group respectfully requests that the Court enter judgment in its favor against AEP on all Counts of its Counterclaims, and award IES compensatory damages in amounts to be proven at trial, punitive damages, injunctive relief, attorneys' fees and all such other relief determined to be just and appropriate.

**ANSWER:** AEP-E denies that IES is entitled to prevail on any of its claims and denies that IES is entitled to any of the relief that it requests.

## AFFIRMATIVE DEFENSES TO IES COUNTERCLAIM

1. Each of the Counts in IES' Counterclaim fails to state a claim upon which relief may be based.

2. All of the Counts in the Counterclaim are barred by the doctrines of laches, estoppel, unclean hands and illegality, as the unlawful and breaching conduct of IES in refusing to check numbers on the Do-Not-Call List, and of then misrepresenting its compliance once the *Charvat* lawsuit had been filed, preclude all recovery on any Counterclaims.

3. Because all of the statements attributed to AEP-E by the Counterclaim, if actually proved, were true and accurate when made, such statements cannot constitute defamation, unfair competition or unfair trade practices.

4. All of the statements attributed to AEP-E by the Counterclaim, if actually proved, were privileged.

5. IES' own multiple and repeated material breaches of the Contracts preclude its claims for relief under those agreements.

6. IES has failed to mitigate damages, if there are any damages.

Dated: March 28, 2016

Respectfully Submitted,

AEP Energy, Inc.

By: <u>/s/ James L. Thompson</u>

One of Its Attorneys

James L. Thompson
Lynch Thompson LLP
150 South Wacker, Suite 2600
Chicago, IL 60606
(312) 445-4623
jthompson@lynchthompson.com

## **CERTIFICATE OF SERVICE**

    I, James L. Thompson, an attorney, verify that I served a copy of the foregoing on counsel for defendant via the court's electronic filing system on all counsel of record on March 28, 2016.


                                              By:   s/ James L. Thompson


Peter S. Roeser
John E. Bucheit
Monica Singh
Matthew Tanner
Roeser Bucheit & Graham LLC
2 N. Riverside Plaza, Suite 1420
Tel. (312) 621-0303
proeser@rbglegal.com